**Slip Op. 00-65**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: RICHARD W. GOLDBERG, JUDGE**

| | |
|---|---|
| PESQUERA MARES AUSTRALES LTDA., | |
| Plaintiff, | |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant, | Court No. 98-08-02680 |
| and | |
| COALITION FOR FAIR ATLANTIC SALMON TRADE, | |
| Defendant-Intervenor. | |

[Contested portion of Defendant's Final Determination sustained.]

Dated: June 5, 2000

Arnold & Porter, (Michael T. Shor and Kevin T. Traskos) for plaintiff Pesquera Mares Australes.

David W. Ogden, Acting Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Lucius B. Lau, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice; Office of the Chief Counsel for Import Administration, United States Department of Commerce (Ann Talbot and Stacy J. Ettinger), of counsel, for defendant.

Collier, Shannon, Rill & Scott, PLLC, (Michael J. Coursey, and David C. Smith, Jr.)for defendant-intervenor Coalition for Fair Atlantic Salmon Trade.

OPINION

**GOLDBERG, Judge:** In this action, the Court reviews a challenge to the Department of Commerce's ("Commerce") Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon From Chile, 63 Fed. Reg. 31,411 (June 9, 1998) ("Final Determination"). Plaintiff Pesquera Mares Australes Ltda. ("Pesquera") argues that Commerce's Final Determination is neither in accordance with law nor supported by substantial evidence because Commerce failed to distinguish between super-premium and premium grade fresh Atlantic salmon ("salmon").

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c)(1994). The Court sustains Commerce's determination to treat super-premium and premium grade salmon as identical merchandise.

## I.
## BACKGROUND

On July 2, 1997, Commerce initiated an antidumping duty investigation to determine whether imports of salmon were being or were likely to be sold in the United States at less-than-fair-value. See Initiation of Antidumping Duty Investigation: Fresh Atlantic Salmon From Chile, 62 Fed. Reg. 37,027 (July 10, 1997).

After determining that it would be impracticable to examine all Chilean producers and exporters of salmon, Commerce decided to limit its investigation to the five largest Chilean exporters. See Notice of Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination: Fresh Atlantic Salmon From Chile, 63 Fed. Reg. 2,664, 2,664-66 (Jan. 16, 1998)("Preliminary Determination"). Commerce published its Final Determination on June 9, 1998. See 63 Fed. Reg. at 31,411.

## II.
## STANDARD OF REVIEW

Commerce's Final Determination will be sustained if it is supported by substantial evidence on the record and is otherwise in accordance with law. See 19 U.S.C. § 1516a(b)(1)(B)(1994).

To determine whether Commerce's interpretation of a statute is in accordance with law, the Court applies the two-prong test set forth in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). Chevron first directs the Court to determine "whether Congress has directly spoken to the precise question at issue." See id. at 842. To do so, the Court must look to the statute's text to ascertain "Congress's purpose and intent." Timex V.I., Inc. v. United States, 157 F.3d 879,

881 (1998) (citing Chevron, 467 U.S. at 842-43 & n.9).  If the plain language of the statute is not dispositive, the Court must then consider the statute's structure, canons of statutory interpretation, and legislative history.  See id. at 882 (citing Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 470-80 (1997)); Chevron 467 U.S. at 859-63; Oshkosh Truck Corp. v. United States, 123 F.3d 1477, 1481 (Fed. Cir. 1997)).  If, after this analysis, Congress's intent is unambiguous, the Court must give it effect.  See id.

If the statute is either silent or ambiguous on the question at issue, however, "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  Chevron, 467 U.S. at 843 (footnote omitted).  Thus, the second prong of the Chevron test directs the Court to consider the reasonableness of Commerce's interpretation.  See id.

With respect to Commerce's factual findings, the Court will sustain Commerce's determinations if they are supported by substantial evidence.  "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion."  Ceramica Regiomontana, S.A. v. United States, 10

CIT 399, 405, 636 F. Supp. 961, 966 (1986) (citations omitted), aff'd, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).  In applying this standard, the Court must sustain Commerce's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions.  See Atlantic Sugar, Ltd. v. United States, 2 Fed. Cir. (T) 130, 137, 744 F.2d 1556, 1563 (1984).

## III.
## DISCUSSION

The Court reviews Commerce's decision to treat super-premium and premium salmon as "identical in physical characteristics." The Court finds that Commerce's determination is in accordance with law and supported by substantial evidence.

**A.**   **Commerce Acted in Accordance with Law in Treating Super-Premium and Premium Salmon Sold in Japan as "Identical in Physical Characteristics" with Premium Salmon Sold in the United States.**

Under U.S. antidumping law, Commerce determines dumping margins "by comparing the weighted average of the normal values to the weighted average of the export prices (and constructed export prices) for comparable merchandise."  19 U.S.C. § 1677f-1(d)(1)(A)(i)(1994).  "Export price" and "constructed export

price" are the prices at which the subject merchandise is sold in the United States.  <u>See</u> 19 U.S.C. § 1677a(a),(b)(1994).  In this case, normal value is "the price at which the <u>foreign like product</u> is sold . . . for consumption in a country other than the exporting country or the United States."  19 U.S.C. § 1677b(a)(1)(B)(ii)(1994)(emphasis added).  To determine "foreign like product," Commerce follows the directive of the antidumping statute:

> The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:
>
> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> (B) Merchandise-
>
> > (i) produced in the same country and by the same person as the subject merchandise,
> >
> > (ii) like that merchandise in component materials and in the purposes for which used, and
> >
> > (iii) approximately equal in commercial value to that merchandise.

(C) Merchandise-

> (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation

> (ii) like that merchandise in the purposes for which used, and

> (iii) which the administrating authority determines may reasonably be compared with that merchandise.

19 U.S.C. §1677(16) (1994).

In this case, pursuant to the statute, Commerce evaluated whether Chilean exporters were dumping salmon in the United States by comparing salmon prices in the United States to salmon prices in Japan. See id. For purposes of the Preliminary Determination, Commerce accepted Pesquera's suggestion that a physical distinction existed between super-premium and premium grade salmon sold in Japan. See 63 Fed. Reg. at 2,666 n.3. If such a distinction existed, Commerce presumably would not be able to treat the two grades of salmon as "identical in physical characteristics" to the premium grade salmon sold in the United States.

In the Final Determination, however, Commerce declined to

recognize a distinction between super-premium and premium grade salmon sold in Japan.  See 63 Fed. Reg. at 31,414.  Commerce determined "that the differences between super-premium and premium salmon are so minor as to not warrant separate classification in an antidumping analysis."  Id. at 31,414. Thus, Commerce treated the super-premium and premium salmon sold in Japan as "identical in physical characteristics" with the premium salmon sold in the United States.  See Final Determination, 63 Fed. Reg. at 31,415.

Pesquera maintains that the two grades of salmon are physically distinct, see Initial Br. of Pl. Pesquera Mares Australes, Ltda. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pesquera's Br."), at 32-35, 41-42, and therefore that, under the statute, Commerce is prohibited from treating super-premium grade salmon as identical in physical characteristics with premium salmon.  See id. at 24-37.  According to Pesquera, the premium salmon sold in Japan alone falls under Section 1677(16)(A) of the statute, while the super-premium salmon sold in Japan falls under Section 1677(16)(B) or Section 1677(C).  See id.

Pesquera reasons that Commerce cannot treat merchandise as

"identical in physical characteristic" unless the merchandise is exactly alike. See id. at 29. Further, Pesquera argues that if merchandise has commercially distinct characteristics that cause material price differences, the merchandise cannot have "identical physical characteristics." See id. at 32. Pesquera claims that the statutory structure compels such a conclusion because it provides for an alternative designation of similar, but not identical, merchandise. See id.

The Court does not agree. Under a Chevron analysis, "identical in physical characteristics," as used in the statute, is an ambiguous term. See 467 U.S. at 842-43. Pesquera is correct that the literal meaning of "identical" is "the very same" or "exactly alike or equal." See Webster's New World Dictionary 696 (2d College ed. 1984). Yet, such an interpretation of the term would frustrate the purpose of the statute. The statute states that Commerce should consider "[t]he subject merchandise and other merchandise which is identical in physical characteristics." 19 U.S.C. § 1677(16)(A)(emphasis added). Since "subject merchandise" is defined by the statute to mean "the class or kind of merchandise that is within the scope of an investigation," 19 U.S.C. § 1677(25), Congress's inclusion

of "other merchandise" in Section 1677(16)(A) suggests that Congress intended to include merchandise that was not "exactly the same." Further, the statute does not direct Commerce how to decide whether merchandise is identical in physical characteristics. Additionally, the Court of International Trade has implicitly indicated that the phrase "identical in physical characteristics" does not mean exactly alike. See Rautauruukki Oy v. United States, 1998 WL 465219 at *5.

The Court of Appeals for the Federal Circuit and Commerce have previously recognized the ambiguity in this statutory provision. See Koyo Seiko Co. v. United States, 66 F.3d 1204, 1209 (Fed. Cir. 1995) (finding that Congress delegated authority to Commerce because of a "gap" in the statute); Roller Chain, Other Than Bicycle From Japan: Final Results and Partial Recission of Antidumping Duty Administrative Review, 63 Fed. Reg. 63,671-78 (November 16, 1998) (antidumping statute does not detail the methodology to be used by Commerce). Accordingly, because the statute is ambiguous, the Court will affirm Commerce's interpretation of the statute as long as it is reasonable. See Chevron, 467 U.S. at 842-43.

In practice, Commerce conducts a case-by-case evaluation to

determine whether merchandise is identical in physical characteristics.  See, e.g., <u>RHP Bearings Ltd., NSK v. United States</u>, 83 F.Supp.2d 1322(1999); <u>AK Steel Corp. v. United States</u>, No. 970-152, 96-05-01312, 1997 WL 728284, *11-13 (CIT Nov. 14, 1997); <u>Notice of Final Determination of Sales at Less Than Fair Value: Certain Cut-To-Length Carbon-Quality Steel Plate Products from Korea</u>, 64 Fed. Reg. 73,196, 73,200-01 (Dec. 29, 1999). Under this evaluation, Commerce utilizes various methods of analysis, taking into account the specific characteristics of the merchandise and the relevant market.[1]  <u>See</u> <u>id.</u>  Therefore, to determine the reasonableness of Commerce's statutory interpretation, the Court must look at the specific methods used here by Commerce.

The Court finds that in this case, Commerce's determination regarding the identical nature of super-premium and premium grade

---

[1] Commerce's asserts that it analyzes only "commercially meaningful characteristics" to determine if merchandise is identical.  <u>See</u> Def.'s Mem. in Opp'n to the Rule 56.2 Mot. for J. Upon the Agency R. Filed by Pesquera Mares Australes Ltda. ("Commerce's Br."), at 28-30.  It is the Court's view that the phrase "commercially meaningful characteristics," as used by Commerce in its prior determinations and in its briefs in this case, has no independent substantive meaning.  Rather, as noted, Commerce appears to conduct an ad hoc analysis each time it analyzes whether merchandise is identical.

salmon is "a reasonable means of effectuating the statutory purpose" and is thus in accordance with law. See Ceramica Regiomontana, 636 F.Supp. at 966. Before issuing the Preliminary Determination, Commerce solicited and received comments from the parties regarding the physical characteristics of different salmon grades. See 63 Fed. Reg. at 2,664. Pesquera asserted that super-premium and premium salmon were two distinct grades. See id. at 2,666 n.3. In the Preliminary Determination, Commerce tentatively adopted Pesquera's assertion. See id. At verification, however, Commerce determined that the evidence on the record demonstrated that both super-premium and premium grade salmon sold in Japan were "identical" in grade to premium grade salmon sold in the United States. See Final Determination, 63 Fed. Reg. at 31,413-15. Therefore, Commere treated this merchandise as identical. See id. In reaching such a conclusion, Commerce reasoned that nominal differences in the merchandise did not prevent the merchandise from being identical under the statute. See id. In this case, Commerce's procedures were a "reasonable means of effectuating the statutory purpose" because Commerce's intent and effect was to identify what, if any, merchandise was identical under the statute.

Because Commerce took comments from interested parties and investigated the evidentiary basis for the claims, Commerce's analysis was evenhanded and well informed. Moreover, because the statute is ambiguous and because the statutory language and structure indicate that Congress likely intended Commerce to consider merchandise that was not exactly the same as identical, the Court finds that Commerce's methodology was a reasonable interpretation of the statute. Because Commerce's actions were a reasonable interpretation of the statute, Commerce's decision was in accordance with law. See Chevron, 467 U.S. at 842-43.

**B.** **Commerce's Determination that Super-Premium and Premium Salmon Sold in Japan were Identical to Premium Salmon Sold in the United States is Supported by Substantial Evidence.**

Commerce determined, based on evidence in the record, that any differences between super-premium and premium salmon were "nominal." See Final Determination, 63 Fed. Reg. at 31,414. Because any physical differences between the grades were nominal, Commerce reasoned that the merchandise was identical for purposes of the statute. See id.

Pesquera claims that the evidence on the record does not support Commerce's decision. See Pesquera's Br., at 41-48. Specifically, Pesquera claims that (1) Commerce ignored physical

differences between super-premium and premium grade salmon,(2) Commerce misinterpreted evidence concerning meat color, and (3) evidence concerning salmon production in other countries was improperly considered and irrelevant.  See id. at 8-16, 41-48; Reply Br. of Pesquera Mares Australes, Ltda. in Supp. of Rule 56.2 Mot. for J. on the Agency R. ("Pesquera's Reply Br."), at 15-41.  The Court considers each argument in turn and holds that, while other conclusions might be drawn from the record, Commerce's determination is supported by substantial evidence.

### 1.    Commerce did Not Ignore Evidence on the Record.

Pesquera argues that Commerce ignored evidence of physical differences between super-premium and premium salmon.  See Pesquera's Br., at 41-42.  Commerce, however, acknowledged that physical differences existed between super-premium and premium grade salmon.  See Final Determination, 63 Fed. Reg. at 31,414. Commerce explained that "[d]epartment verifiers observed that there were in fact minor differences between salmon classified as premium and salmon classified as super-premium, such as small scale loss or light lacerations.  These minor differences, however, do not establish a different grade of salmon for purposes of our analysis."  Id.  Thus, Commerce did not ignore

physical differences, but chose to consider these differences to be so minor as to be irrelevant to the analysis.  Because "identical" does not necessarily mean "exactly alike," see supra, Section III.A., this reasoning is well within Commerce's discretion.  Cf. Steel from Germany, 60 Fed. Reg. 65,264, 65,271 (December 19, 1995) (considering products as identical when merchandise dimensions were different).

   **2.    Commerce's Finding That Meat Color is Not a Distinction Between Grade is Supported by Substantial Evidence.**

   In its pre-verification filing, Pesquera claimed that salmon meat color was the "single most important" distinction between super-premium grade and premium salmon.  See Final Determination, 63 Fed. Reg. at 31,414.  At verification, Commerce determined that in practice salmon classified as super-premium had the same meat color as salmon classified as premium.  See id.  Based on this evidence, Commerce concluded that super-premium and premium salmon should be considered to have identical physical characteristics for purposes of the statute.  See id. at 31,415.

   Pesquera claims that Commerce erroneously found that super-premium and premium grades had the same meat color.  See Pesquera's Br., at 42 n.89; Pesquera's Reply Br., at 30, 31-40.

Moreover, Pesquera asserts that it never claimed that meat color was the primary distinction between super-premium and premium grade salmon.  See Pesquera's Br., at 42-43.

The Court finds that Commerce marshaled substantial evidence that in practice super-premium and premium grade salmon were not distinguished based on meat color.[2]  See Final Determination, 63 Fed. Reg. at 31,415; Commerce's App., Ex. 20 (Internal Commerce Mem. (inspection of Eicomar processing plant), dated Apr. 7, 1998), 2-3.  Specifically, Commerce marshaled evidence (1) that all salmon grades were fed the same amount and type of pigmented food pellets, (2) that these food pellets resulted in a uniform meat color regardless of grade, and (3) that meat color was only occasionally checked during processing.  See Final Determination, 63 Fed. Reg. at 31,415.

Moreover, during the comment period, Pesquera did, in fact, claim that meat color was one of the factors distinguishing

_____

[2]  Commerce contends that it discovered at verification that all super-premium and premium grade salmon were fed the same amount and type of pigmented food pellets.  See Final Determination, 63 Fed. Reg. at 31414.  Pesquera claims that Commerce had that information before verification.  See Pesquera's Reply Br., at 32-33.  The timing is irrelevant. Commerce did not claim that discovering the pigment pellet evidence at the verification, rather than earlier, changed or otherwise affected its position.

super-premium and premium grade salmon.  <u>See</u> App. to Commerce's

Br., Vol. II, at Ex. 10 (Letter from Michael T. Shor to William

M. Daley on Nov. 3, 1997, at 14) ("Of all the grading

differences, the difference in color is perhaps the most

important and most significant.").[3]  And Pesquera submitted

documentary evidence of a purported color distinction between the

grades to Commerce.[4]  <u>See, e.g.</u>, App. to Commerce's Br., Vol. II,

at Ex. 9 (Letter from Michael T. Shor to William M. Daley on Oct.

10, 1997, Attach. 1 (Asociacíon Standards)).  Based on this

evidence, Commerce concluded that the physical characteristic --

meat color --  Pesquera claimed distinguished super-premium from

---

[3]  Pesquera claims that this statement was made concerning
filleted salmon only.  <u>See</u> Pesquera's Reply Br., at 32.
Pesquera, however, mischaracterizes its prior position.  The
statement was made in a general discussion of the differences
between super-premium and premium grade salmon.  <u>See</u> App. to
Commerce's Br., Vol. II, at Ex. 10 (Letter from Michael T. Shor
to William M. Daley on Nov. 3, 1997, at 14-15).  Following the
statement, Pesquera offered an example using filleted salmon to
illustrate its general contention.  <u>See</u> <u>id.</u>

[4]  Pesquera blatantly mischaracterizes the record evidence
by arguing that the Asociación de Productores de Salmón y Trucha
de Chile (A.G.) standards do not distinguish between super-
premium and premium grade salmon based, in part, on meat color.
<u>See</u> Pesquera's Reply Br., at 34-37.  In fact, the Asociación
standards require a meat color of fourteen for premium salmon and
a meat color <u>above</u> fourteen for super-premium salmon.  <u>See</u> App.
to Commerce's Br., Vol. II, at Ex. 9 (Letter from Michael T. Shor
to William M. Daley on Oct. 10, 1997, Attach. 1 (Asociacíon
Standards)).

premium grade salmon was in practice not a distinction.  See
Final Determination, 63 Fed. Reg. 31,414.  This evidence supports
Commerce's conclusion that the distinction between super-premium
and premium grade salmon is either non-existent or nominal.

### 3. Commerce's Determination is Properly Supported by Substantial Evidence of the Classification Standards of the General Industry.

In the Final Determination, Commerce referred to salmon
industry classification standards to support its determination
that super-premium and premium grade salmon were identical.  See
63 Fed. Reg. at 31,414-15.  Commerce stated that industry
standards in Norway, Scotland, Canada, and the United States make
no distinction between super-premium and premium grade salmon.
See id.  Commerce claimed that these standards support the
conclusion that super-premium and premium grade salmon must be
treated as identical merchandise under the statute.  See id.

Pesquera claims that Commerce improperly considered evidence
of industry practice when its analysis concerning grade should
have been restricted to Pesquera's practice only.  See Pesquera's
Br., at 43-48. Pesquera bases this argument on the "same person"
language of the statute.  See 19 U.S.C. § 1677(16); Pesquera's
Br., at 43-48.  Pesquera also claims that the record does not

contain evidence of industry standards supporting Commerce's

determination.  <u>See</u> Pesquera's Br., at 43-48.

The Court does not agree.  The statute on its face does not

prohibit Commerce's evaluation of industry standards when

determining whether particular products are identical.  <u>See</u> 19

U.S.C. § 1677(16).  The "same person" language of the statute

applies only to the origin of the merchandise, not to whether

particular merchandise is identical.  <u>See</u> <u>id.</u>  Moreover, the

Court cannot find, and Pesquera does not supply, any authority

which restricts evidence to the individual producer's standards.[5]

Under <u>Chevron</u>, Commerce's use of industry standards to

evaluate whether merchandise is identical is a reasonable

---

[5]  Pesquera does offer three Commerce decisions to support
its argument.  <u>See</u> <u>Certain Pasta from Italy</u>, 61 Fed. Reg. 30,
326, 30,346 (June 14, 1996); <u>Certain Corrosion-Resistant Carbon
Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate
from Canada</u>, 61 Fed. Reg. 13,815, 13,821 (March 28, 1996);
<u>Certain Cut-to-Length Steel Plate from Finland</u>, 63 Fed. Reg.
2,952, 2,954-55  (Jan. 20, 1998).  These Commerce decisions,
however, do not support Pesquera's position.  <u>Certain Pasta from
Italy</u> and <u>Corrosion-Resistant Carbon Steel from Canada</u> concern
the selection of product matching criteria.  <u>See</u> <u>Certain Pasta
from Italy</u>, 61 Fed. Reg. at 30,346; <u>Corrosion-Resistant Carbon
Steel from Canada</u>, 61 Fed. Reg. at 13,821.  These determinations
do not analyze whether the merchandise is identical under such
criteria.  <u>See</u> <u>id.</u>  <u>Certain Cut to Length Steel Plate from
Finland</u> is even more inappropriately cited, as this decision
concerns an adverse inference of a missing conversion factor.
<u>See</u> 63 Fed. Reg. at 2,954-55.

interpretation of the statue.  See 467 U.S. at 843.  As discussed above, the statute does not direct Commerce in regard to the term identical.  See 19 U.S.C. § 1677(16).  Thus, Commerce is free to employ reasonable methodology to determine whether merchandise is identical.  See Chevron 467 U.S. at 843.  Commerce's consideration of industry standards is reasonable because industry standards indicate what most salmon producers consider to be identical merchandise.

Further, the record contains substantial evidence of the industry standards of several countries.  The Final Determination refers to direct evidence of Scottish standards. See 63 Fed. Reg. at 31,414 n.2.  And, contrary to Pesquera's claims, the administrative record contains evidence concerning the industry standards of Norway, Canada, and the United States.  See App. to Commerce's Br., Vol. I., at Ex. 8 (Letter of Aug. 14, 1997 from Michael J. Coursey, et al. to Sec. of Commerce, 3); App. to Commerce's Br., Vol. II, at Ex. 10 (Letter of Nov. 3, 1997 from Michael T. Shor to William M. Daley, 20); App. to Commerce's Br., Vol. II, at Ex. 12 (Letter of Dec. 11, 1997 from Collier, Shannon, et al. to Sec. of Commerce, Ex. 2 at 3)(affidavit of Canadian industry participant); App. to Commerce's Br., Vol. III,

at Ex. 19 (Mem. Of Apr. 7, 1998 from Gabriel Adler and David Dirstine to Gary Taverman, 13); App. To Commerce's Br., Vol III, at Ex. 22 (Pet.'s Case Br. at 17, 21).  Such information, although not dispositive, is evidence supporting Commerce's conclusion.

## IV.
## CONCLUSION

For all of the foregoing reasons, the Court sustains the portions of the Final Determination pertaining to Commerce's decision to treat super-premium and premium grade salmon as identical merchandise.  A separate order will be entered accordingly.

_____
                                    Richard W. Goldberg
                                    JUDGE

Date:    June 5, 2000
         New York, New York

ERRATA

<u>Pesquera Mares Australes Ltda., v. United States</u>, Slip Op. 00-65, dated June 5, 2000

Page 7, line 8, following the word "investigation" insert a comma
Page 12, line 14, delete "Commre" and substitute "Commerce"